IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

DANIEL R. GRAHAM,

        Plaintiff,

        vs.                    Case No. 09-1046-JTM

GRAYBAR ELECTRIC COMPANY, INC.,
        Defendant.


MEMORANDUM AND ORDER


      This is an action for age and gender discrimination and retaliation brought by plaintiff Daniel Graham against his former employer, Graybar Electric Company. Graybar has moved for summary judgment. For the reasons stated here, the court finds that defendant's motion should be granted.


**Findings of Fact**

      Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Graham alleges that Graybar denied him a promotion to the Manager of Customer Service position based upon his age and gender; and that he was terminated in retaliation for opposing age and gender discrimination when he complained about the promotion. Graham was born December 20, 1961.

Graham claims that the following individuals discriminated against him: John Herbert (District Human Resources Manager for Graybar's Wichita facility), Susan Palmer (District Director of Operations), Dolan Cook (Branch Manager of the Wichita facility beginning in August 2007), and Amy Denney (Customer Services Manager in Wichita in 2008).

Graybar hired Graham on December 1, 2004, less than one month before he turned 43. Graham became a Project Specialist II in February 2007 and held that position through the conclusion of his employment with Graybar. He was 46 when he was terminated on October 7, 2008.

Graham testified that as Project Specialist, he was responsible for ensuring that all sales orders for contractors and subcontractors (taken by sales representatives) were completed and filled. He elaborated, stating that he managed project orders given to Graybar by electrical contractors and subcontractors from cradle to grave. He also performed the duties of a general customer service representative, which included the acceptance, processing, shipping, follow-up, and anything and everything that had to do with moving material that customers ordered from the vendor to the customer's hands. The sales agents were actually responsible for making sales and communicating with customers.

On March 1, 2005, Branch Manager Chris Rolen, completed a three-month evaluation of Graham's performance, giving him an overall rating of "Below Expectations." Rolen noted: (1) "there is concern about organizational skills and communication"; (2) Graham "seems unfocused as to what is the most important aspect of job"; and (3) "made many small errors" that "could have potentially cost Graybar a lot of lost revenue." (Def's Exh. 2.)

On May 10, 2005, Rolen completed a six-month evaluation of Graham's performance. He again found Graham's performance to be "below expectations," noting that "lack of experience, communication and organization are still the main concerns." (Def.'s Ex. 3.) Rolen also wrote a memo in connection with this evaluation, in which he noted that Graham continued to have problems with Graybar's billing system, despite receiving seven additional days of one-on-one training with four separate managers from other facilities. In his response to the motion for summary judgment, Graham has stated that "quality training" at Graybar was "non-existent." (Plaintiff. Exh. A. at 134-37). It is uncontroverted that Graham admitted to Rolen that his lack of experience in the industry affected his ability to work efficiently and accurately.

A related "Goal Setting Worksheet" completed on May 11, 2005, noted that Graham "has had several errors in his daily work that effect customer relationships. These errors include quoting jobs to the wrong contractor, incorrect job name on quotes, incorrect pricing on bids, and incorrect BOMs." (Def. Exh. 5). Graham states in his response that he did not have 100% control over his

workspace – the disorganization was the fault of his co-workers leaving materials on, in, or under his desk.

In November 2007, Graybar managers discussed whether additional training would help Graham. The Manager of Customer Service at the time, Robert Bieri, noted in an email to Scott Neubauer: "We realize from several customers that Danny's work is not to the quality it needs to be, and he does not have the trust and confidence of the customers now." (Def. Exh. 6).

Graham admitted in his deposition that Chris Rolen and Dolan Cook had written emails indicating that customers had lost faith in Graham.[1]

For the remainder of his employment, Graham never received an "Exceeds Expectations" rating. Rather, his next two managers rated him as only "Keeping with Expectations," on January 17, 2006 (evaluation by Jeff Tibbs), February 6, 2007 (evaluation by Robert Bieri), and February 4, 2008 (evaluation by Robert Bieri).

Graham does not believe Chris Rolen's or Jeff Tibbs's evaluation of his performance was motivated by his age or gender. He also does not believe that Robert Bieri discriminated against him at any time. He admits that from 2006 through the conclusion of his employment, management was concerned about his organizational skills and ability to prioritize tasks.

In his February 2008 self-evaluation (Def. Exh. 10)., Graham wrote:

> I consider myself to be a well rounded individual when it comes to both learned and practical knowledge . . . and as far as abilities . . . don't make me blush. Although I am sure I do not know EVERYTHING about any ONE thing . . . I think Graybar's 3-year experience with me so far has a proven track record that I do, however, know a hell of a lot about everything.

He also wrote, under the evaluation's "Formal Educational Courses Since Last Review" section, "Who has the time?" Under the "Career Interests" section, Graham wrote, "Full retirement and if that is not possible in the near future . . . CEO." He also responded that the training needed for his next

---

[1]In this context, Graham cites (Resp. at ¶ 16) his February 6, 2007 evaluation, in which Bieri wrote that "Danny has a great repoire [sic] with our customers." (Def. Exh. 8). But Graham explicitly conceded in his deposition that other managers at Graybar had received information that customers were losing faith in him. (Graham dep. at 189).

assignment was to "[w]in the Lottery, or embark on a very successful political campaign with the Board OF directors [sic]."

In his response, Graham argues that his "Career Interest" responses were an inside joke between Robert Bieri and himself.

On June 8, 2007, Bieri received a complaint (Def. Exh. 11) from co-worker Stefani Lowe, stating that Graham was "harassing" her at work and acting inappropriately. She stated:

> I am not used to having coworkers taunt me during my work day and go out of their way to amuse themselves at my expense. . . . I've ignored him, I've asked him to stop. I've been rude back to him, etc etc. . . . Please help me.

Graham did not disagree with Lowe's description of their interactions, except to deny that it happened on more than one occasion. According to him, he was tired of Lowe's fax box always being full so he put the faxes under her nose. He admits that it was probably not the appropriate thing to do.

Graybar hired Amy Denney in December 2005 to work in a Material Handler/Counter Sales position at Graybar's Twentynine Palms facility in California. Denney (who was born on March 10, 1984) received an "Above Expectations" rating in her January 10, 2007 performance evaluation as a Counter Sales Rep II in California. Her manager noted:

> Your attention to detail is exceptional, and this is directly reflected in your practically error free performance. Our warehouse has become a first-class operation due largely to your ability to perform all of the above tasks in an efficient and professional manner. You have gained the confidence of your customers over the last year, consistently improving your skills and knowledge of integrated supply materials. You always give each customer good service. You are a self motivated, intelligent, hardworking employee. As a new employee, you quickly gained the respect of our customers. I have received many compliments from them, in regards to your work performance.

(Def. Exh. 13).

Denney moved to Graybar's Wichita facility in the summer of 2007, to work as a Material Handler. In January 2008, she moved up to the position of Customer Service Representative, reporting to Bieri.

After only a short time in that role, she received a "Meets Expectations" rating in her March 15, 2008 performance evaluation. Her manager added the following notation: "I believe Amy is in the right job, is a valuable asset to Graybar, and will be excellent in this role, and capable of many other roles at Graybar in her career." (Def. Exh. 14).

Graybar maintains a website where employees can access its policies, which include a corrective action policy. Graham has acknowledged that he received and reviewed Graybar's policy prohibiting discrimination and harassment. He understood that Graybar's policies prohibited discrimination, and that employees were expected to report any violations of the Non-Discrimination and Harassment-Free Workplace Policy.

Graybar posted the vacancy for the Manager of Customer Service on August 1, 2008. Three candidates applied for the position through the company's electronic self nomination procedure: Graham, Denney, and Jeff Schelinder. Schelinder, was located in Fargo, North Dakota, and Graybar's Branch Manager Dolan Cook had concerns about his ability to immediately relocate to Wichita. Cook decided there was no need to formally interview Schelinder.

The Manager of Customer Service job description (Def. Exh. 16) listed the following preferences:

**Education:** College degree or equivalent experience.

**Experience:** Prior branch supervisory experience with a strong background in customer service preferred.

**Knowledge:** Broad knowledge of company's products, services, and operations preferred. Understanding and commitment to company quality goals and standards. Ability to work with all levels of employees and management, both internally and externally. Excellent communication skills and leadership skills required. Ability to effectively train and instruct in both group setting and one-on-one. Ability to effectively present company services and quality standards to customers. Ability to handle customer complaints and mediate customer disputes.

Graham did not have a college degree.

On August 12, 2008, Cook interviewed Denney and Graham.

Graybar's Self-Nomination Guidelines explicitly provides that the company is "not obligated to interview every candidate" for management positions. (Def. Exh. 19).

In his deposition, Graham admits that, before the selection was made, he had sent instant messages to co-workers and Robert Bieri that he did not want the "headaches" that went along with the position, that no one would want them. (Graham Dep. at 179-80, 184).

During their interview, Cook asked Graham to describe a situation where he had made a decision that management disagreed with, Graham responded, "As long as I don't get fucked, everything is fine." Graham also said he was most dissatisfied with work when overwhelmed by the volume, from which Cook inferred that Graham might lack the multi-tasking skills required for the MCS position.[2] Finally, when Cook asked Graham why he was applying for the MCS position and what he would do with the extra pay, Graham answered that he wanted to make more money and purchase a helicopter for himself. Cook noted that all reasons were for his own personal gain.

Cook gave Graham an interview rating of -2 for his communications skills, and 0 for his impact rating. Denney received higher ratings than Graham for her interview with Cook: she received a +4 for communication skills and a +4 for her impact rating.

Cook made the decision to promote Denney to the MCS position because he believed she was the best candidate for the job, based upon her employment history and her interview.

In his response, Graham suggests that the decision had already been made to select Denney for the position.[3] He notes that, shortly after Susan Palmer's July 29, 2008 announcement that Bieri

---

[2]Graham argues that Cook's subjective responses to his answers are immaterial. But the entire foundation for Graham's discrimination claims is whether Cook promoted Denney based on age or gender, or because he believed Denney was the most qualified candidate. Thus, as the decision maker, Cook's belief as to how each candidate performed during his or her interview is relevant. *See, e.g., Furr v. Seagate Tech.*, 82 F.3d 980, 988 (10th Cir. 1996).

[3]Graham's response also notes testimony from his deposition in which he described a conversation with Cook on August 8 where Cook indicated that he had "the understanding that Susan Palmer had already selected her successor." (Graham dep. at 95). Graham provides no credible explanation, however, for why he went through with the subsequent interview if he really believed such a selection had already been made. More importantly, however, Graham's response supplies no basis for the admissibility of Cook's hearsay statement.

was stepping down as Manager of Customer Services, he met with Cook and Denney in a conference room, where he encouraged Denney to obtain training in St. Louis and to apply for the position. Denney attending training in St. Louis on August 7 and 8, 2008, before Graybar announced its selection of the new Manager of Customer Services.

Denney's promotion to the MCS position was formally announced on August 14, 2008.

In his deposition, Graham testified that he could not agree or disagree whether management had a good reason to believe that Denney was more qualified than him:

Q:    Having reviewed all these documents where you've had management say that they didn't think you were performing at expectations twice, management said that your error rate was too high throughout, management stated that your organization was not good throughout, having one - having customers, according to management, complain about a loss of confidence in you, do you believe that in light of all of these performance issues that management was not - did not have good reason to think that Miss Denney would be a better candidate than you?

A:    I cannot disagree or agree either way because the workload, the job responsibility, the number of customers served, the responsibilities to be reactive to the inputs that I got compared to hers is totally different.

(Graham Dep. at 189-90).

Graham states that he engaged in protected activity by complaining to Dolan Cook (verbally), Robert Bieri (verbally) and John Herbert (via e-mail) on August 14, 2008 regarding alleged discrimination. He also claimed to have complained to a few non-management co-workers.

Graham's August 14, 2008 e-mail to John Herbert does not explicitly reference any claim of discrimination, referring instead to an "issue" for which he was seeking "outside advocacy." (Def. Exh. 26).[4] Graham testified that in a later meeting with Herbert, he orally complained of

---

[4]In fact, Graham's email to Herbert actively refused to explain the nature of his grievance. He wrote:

Mr HERBERT,

AS SOON AS I CALM MYSELF DOWN ENOUGH AND GET MY BLOOD BACK DOWN TO AT LEAST A LOW BOIL ..... I INTEND TO PRESENT A GREIVANCE [sic] FOR YOUR REVEIW [sic] CONCERNING AN ISSUE. I NEED FROM YOU ANY AND ALL INFORMATION NECESSARY REGARDING THE PROCEDURES TO FORMALLY ENGAGE YOUR

discrimination in general, but cannot remember whether he complained of age or sex discrimination. Herber testified that Graham complained of "illegal" conduct, but did not mention anything specific.

On August 18, 2008, Denney, as the acting Manager of Customer Services, politely asked Graham to complete additional notes to explain why a product had been returned. Graham responded in an e-mail:

> THESE ELEMENTS OF INFORMATION ARE ALREADY INCLUDED IN THE SAP PROVIDED FIELDS FOR A RETURN. THIS INFO IS REDUNDANT AND UNNECESSARY.

(Def. Exh. 27).

A few days later, on August 22, co-worker Ryan Schartz asked Denney for help because Graham had told him he would not add additional notes to a customer change order. Denney approached Graham, who told her that he did not know why the customer had changed the order, and to ask sales. Denney told Graham that it was his job to gather all the necessary information, not customer service. Graham concluded the conversation by stating "I am done talking to you," and walked away so abruptly that Denney had to step back out of his way him to avoid him physically running into her.

In his response, Graham states that he "did not immediately refuse to add the notes," and that it was only "[a]fter Denney had asked [him] the same question 7 to 10 times," did he stand and "walked away to disengage himself" (Resp. at ¶ 53). Graham does not deny that he refused to comply with a directive from Denney, does not deny making the "I am done talking to you" statement, and does not deny that Denney was forced to move out of his way to avoid a collision.

After consulting with John Herbert in Human Resources, Denney sent Graham home for behaving in an inappropriate manner. Graham continued to sit at his computer while Denney told

---

OFFICE IN INVESTIGATING THIS GREIVANCE [sic]. UNFORTUNATELY, **I AM NOT IN A MENTAL STATE RIGHT NOW THAT WOULD ALLOW ME TO CONVEY INTELLIGENTLY TO YOU, THE ISSUES THAT I HAVE SEVERE PROBLEMS WITH**.

(Def. Exh. 26) (Bold emphasis added).

him at least five times that he should leave. At one point, he told her, "I am not searching for a damned thing, I'm closing my applications." (Def. Exh. 27).

According to Graham's Response, Denney did not ask him to leave, she "repeatedly badgered him to leave while he was trying to shut down his computer." (Dkt. 40, at ¶ 53). Graham does not dispute that he refused to immediately comply with an instruction (whether politely phrased or not) from a superior, and does not dispute making the statement attributed to him.

These events were witnessed by Ryan Abplanalp and Jeff Keeny, who felt that Graham acted inappropriately, and reported this to management. Keeny described Graham's conduct as a "tirade" and "condescending verbal attack" and described Graham as "a very sexist person." (Def. Exh. 29). Graham denies being sexist, states Keeny's statements amount to "mere opinions," and that both Abplanalp and Keeny stated that Graham raised his voice and became upset. (Def. Exh. 29). Kenny stated:

> His reaction was way out of line and bordered on a hostile verbal attac[k]. He told her several times to "go back over there" pointing at Amy's desk & "are we done". It appeared that he was making a very simple request into a battleground, or a power struggle. Danny is very sexist person & it really came out Friday."
>
> ....
>
> While his tirade was going on and his condescending verbal attac[k]. I was going to get up to tell Danny that he was way out of line and it is standard policy to put notes on all RSO's, but Amy handled it very professionally. I was proud of her.

(Def. Exh. 30).

On August 26, 2008, Denney and Cook gave Graham a verbal warning for his conduct, which was summarized in a memo.

On September 8, 2008, after he was twice observed smoking somewhere other than the designated smoking location, Denney reminded Graham by e-mail to take his smoke breaks in the designated location, which had also been discussed during branch meetings. Graham refused to follow her instructions, and again smoked outside the designated location on September 17 and 23.

The Response to the motion for summary judgment states that "Graham did not remember" any instructions against smoking, and denies actually reading the September 8 email. (Dkt. 40, at ¶ 57). His deposition testimony is equivocal. Asked on the subject of prior warnings, he responded: "I might have been. I can't agree or disagree." (Graham dep. at 266). He also admitted that he was supposed to smoke at particular geographic corners of the building, and does not controvert that he received the email from Denney on September 8, 2008. With respect to the prior meetings, Graham testified that, "I'm not going to deny that at some point in one of the branch meetings that a northeast corner was discussed." (Id. at 296).

In early September 2008, several customers complained to Dolan Cook about Graham's performance. Cook met with Graham on September 17. After Cook told Graham about the complaints, Graham said that "he did not want to hear that fucking bullshit." (Def. Exh. 34).

In his response, Graham states that he knew nothing of the specifics of the customer complaints until his deposition, and states that Cook spoke to him in the same way.

Graham does not dispute that customers were complaining about his performance in September, 2008. Further, Graham admitted in his deposition that he had "performance issues" for errors in his work "from day one until the day of termination" – that is, before he engaged in any alleged protected activity. (Graham Dep. at 279-80).

Graham received a Written Warning which stated that there were several customer complaints, and he had refused to smoke in the designated location. Graham initially refused to sign the warning, but ultimately signed it on October 1, 2008.

On September 30, 2008, Denney sent an e-mail to Graham asking him to post a LIV, which is a supplier invoice that is posted for a customer to pay the bill. Graham replied, "NO OFFENSE, BUT I REALLY DON'T NEED A BABYSITTER . . . I'VE BEEN DOING THIS FOR 4 YRS . . ."

When informed that his response was unacceptable and insubordinate, Graham announced that he would "butt heads with" Denney as long as she remained in the her position.

As a result of that interaction, Graham received a Second Written Warning, which was presented on October 2, 2008.

On October 7, 2008, Cook observed Graham again smoking outside the designated smoking location, which Cook considered to be a continuing act of insubordination. As a result of this incident and the previous corrective action, Cook and Denney terminated Graham's employment for insubordination.

Graybar's Application for Employment states that "any misstatement or omission of information [in connection with the application] is grounds for dismissal." (Def. Exh. 39).

The "Employment" Section of Graybar's Application for Employment requires all applicants to "list all prior employment and account for periods of unemployment, summer jobs, and military service in consecutive time periods beginning with your most recent job or unemployment period."

Graham completed his application for employment with Graybar on October 27, 2004. He listed only one employer – the United States Air Force – in the Employment Section. The "General Information" Section of Graybar's Application for Employment asks all applicants "Have you ever been fired or asked to resign?" In response to this inquiry, Graham stated, "Not possible in military." (Id.)

Graham testified at his deposition that the United States Air Force was his only prior employer, with the exception of temporary jobs and other irregular employment.

It is uncontroverted that, contrary to his application and deposition testimony, Graham had been employed as a regular, full-time employee for AutoZone from June 19, 2003 through October 7, 2004. He was terminated from AutoZone for "Unprofessional Behavior; Inappropriate Comments; Conduct Detrimental to AutoZone, Fellow-AutoZoners, and AutoZone Customers; and Loss of Confidence." (Def. Exh. 40).

Graybar received AutoZone's records on or about June 19, 2009. It was not aware of Graham's termination from AutoZone during Graham's employment with Graybar. Graham does not

controvert the fact that, if Dolan Cook had known about the termination from AutoZone, he would have terminated Graham's employment.

In his response, Graham suggests that Bieri himself was forced out of the Manager of Customer Services position by Palmer, apparently for age-related reasons, with Graham noting that Palmer had warned Bieri on July 10, 2008 that the Manager of Customer Services "role is changing and we don't think you'll be able to do it" anymore. (Pl. Exh. D at 108-09). She told him that her decision was final.

Bieri called Erica Beckham in the Graybar's St. Louis HR department, and said that he did not think his demotion was right. According to Bieri, he was performing his job in a satisfactory manner. Later the same day, Bieri was called to a lunch meeting at a restaurant with Cook and Palmer, where Palmer told him that she was notified immediately any time anybody goes to HR, and if he wanted to say something he should say it to her and not HR. Bieri was offered the option to take a demotion to the counter position or a customer services representative position in Kansas City. Bieri decided to accept the counter position.

Graybar notes that Bieri was 46-years-old when he was first promoted to the Manager of Customer Relations position. Palmer, who had helped train Bieri, testified that after she became Director of Operations for Graybar in May of 2008, "it became quite evident that [Bieri] had not made any real inroads in learning SAP after two years." (Palmer Dep. at 18).

Graham also presents facts which, he contends, demonstrates that he was the better candidate for the Manager of Customer Services position. Thus, he emphasizes his testimony that he believed his interview on August 12, 2008 went well, but was a farce, a belief both entirely subjective and wholly conclusory. He also notes that while Cook rated him on each of the questions he answered, he did not record similar ratings for Denney.

Graham stresses that Graybar's self nomination procedures provide that "[a]s a general guideline, an employee should have at least one year in a non-exempt salaried position or two years

in an exempt salaried position before self-nominating for another position," and that at the time of the selection, Denney had been in a non-exempt salaried position for seven months. (Plf. Exh. J).

Graham also stresses testimony from Bieri contrasting the responsibilities and skills of a project manager (his position) and a customer service representative (Denney's position), According to Bieri, customer service representative is basically an entry level position which enters and follows the orders of certain specific customers. On the other hand, the project manager entered, followed and placed five times as many orders. In addition, the project manager had daily interaction with sales reps and the branch manager.

Denney had an associate's degree, but no bachelor's degree. Graham claims that he "would have close to a bachelor's degree from the Air Force Academy if he were to go through the process of getting a transcript." (Dkt. 40, at 26). The plaintiff has not produced a transcript or any other documentation in support of his claim.

Graham also stresses that Denney did not have prior branch supervisory experience, and in fact, she had no prior management experience, while Graham had been a supervisor for the last 15 years he was in the Air Force.

Graham also notes positive comments from Bieri about his performance. Bieri stated that Graham was a very good employee; had supervisor experience, knew the business, and was good with customers; his communications were above average; and he was qualified for the MCS position.

Graham notes that, when Palmer spoke with Denney, she did not ask whether Denney had a college degree or equivalent or prior branch supervisory experience. Palmer also did not know what prior positions Denney held, other than her customer service representative position, and never saw Denney's resume or prior performance reviews from 2007 and 2008.

Graham also notes favorable comments from his evaluations. He notes that in his March 1, 2005 evaluation, Chris Rolen stated that Graham was a very smart guy, was learning the job as quickly as expected, and was starting to comprehend basics of the job and SAP processes. The

evaluation also noted that more experience and guidance would help in the areas where Graham was unfocused, that on-going SAP training was necessary to perform his present duties, and that Graham was meeting expectations in attendance and punctuality. Rolen told Graham that the SAP process had just been implemented as a business solution, that nobody knew the SAP system as well as they should, and the learning curve was 6 to 8 months. In a May 10, 2005 evaluation, Rolen stated that Graham was learning the job as quickly as expected, that he gained more confidence in working with SAP for billing and invoicing, on-going SAP training was necessary to perform his present duties and Graham was meeting expectations in attendance and punctuality.

Graham notes favorable comments he received from Jeff Tibbs in January of 2006 and from Bieri in February of 2007. Tibbs wrote that Graham had improved his organizational skills, improved at proof-reading his work, vastly improved his SAP knowledge and processing, had strengths which include electronic development of quotes folders, Excel applications and SAP understanding. Bieri stated that Graham had great rapport with customers and was a key in us achieving Graybar's sales goals. He also wrote that Graham has worked at getting more organized, that he was mechanically minded, good at SAP and a TEAM PLAYER; that Graham had been encouraged to train and teach the new quotes person and to go to lunch with sales representatives and customers to further the relationships the company was trying to build.

The evidence cited by Graham has limited relevance. For example, while it is true that Cook did not record Denny's responses with the same level of detail as Graham's, this may be a function of the fact that she did not give the same sort of flippant and sarcastic remarks as Graham.

While the 2005 evaluations contain some favorable comments, it may be noted that Graham's overall evaluation by Rolen on both occasions was that Graham was performing "below expectations." And, while both Tibbs and Bieri indicated that Graham was "meeting expectations" in the 2006 and 2007 evaluations, but they also noted some deficiencies. Tibbs wrote that Graham "admits he struggles with prioritizing," and that "organization of desk space needs improvement." (Def. Exh. 7). Bieri also wrote: "The more organized Danny gets, his job will become more

manageable and he will be in a better [position] to meet his deadlines;" (2) "Danny needs to be able to keep organizing his work in a manner to meet bid times"; and (3) "Danny must work at winning the trust and confidence of the customers he deals with." (Def. Exh. 9).

With respect to the guidelines for self-nomination promotion, Graybar accurately responds by stressing that they are after all *guidelines*. Further, neither Denney nor Graham had supervisory experience at Graybar. Bieri also testified that both Denney and Graham were "above average" employees and would rank similarly. (Bieri Dep. at 18-19). With respect to Palmer, there is no evidence that Palmer actually made the decision to hire Denney. Further, that she did not know of or inquire about all of Denny's potential qualifications for the Manager of Customer Service may indeed simply be a function of her not being the decision-maker as to the promotion.

According to Graham, when Cook publicly announced the selection of Denney on August 14, 2008, he tried to interject. According to Graham, Cook said, "No, you don't." (Graham Dep. at 223). When Graham spoke to Cook later in his office along with Bieri, he said that he had been a witness to and experienced everything from July 29th to August 14th and thought it was discriminatory. There is no evidence, however, that Graham advanced anything other than a general claim of discrimination. Graham then said he was taking the afternoon off to file a complaint with the Kansas Human Rights Commission (KHRC).

The Complaint Information Sheet filed by Graham with the KHRC cites sex and age discrimination. There is no evidence that the a copy of the complaint was sent to Graybar.

The Graybar Corrective Action Process (Def. Exh. 14) provides the following policies relating to corrective actions taken against employees:

2. POLICY:

2.1   It is Graybar's policy to take corrective action rather than punitive action to resolve performance and/or behavior problems.

2.2   Managers are expected to handle all employees in a fair and consistent manner.

2.3   Managers are expected to address performance issues promptly.

The Process also sets forth the following steps immediate supervisors should employ:

7.1.1. Step One: Management Consultation. Meet with the employee to describe the performance/behavior you have observed, then define the problem and desired performance and/or behavior. ... Schedule a follow up meeting usually no more than thirty (30) days after the discussion.

7.1.2. Step Two: Written Notice of Improvement. If improvement does not occur within the time agreed upon in Step One, then a second meeting should be held followed by a letter confirming the desired performance or behavior and a time frame for improvement.

7.1.3. Step Three: Second Notice Letter. If improvement has not occurred within a reasonable period of time, usually within 30-days from receipt of the first Written Notice of Improvement letter, then a third meeting should be held. [T]he manager should advise the employee that if immediate improvement does not occur, the employee will be terminated.

7.1.4. Step Four: Termination.

(*Id.*)

Graham alleges that none of the corrective action steps taken against him include a scheduled follow up meeting. However, Graham did meet with management regarding his performance on August 26, 2008. In that consultation, management told Graham he must treat Denney with respect going forward. Graham also met with management when he received a written warning on September 17, 2008. The written warning indicated that Graham's insubordination "must stop immediately." (Def. Exh. 33). Management met with Graham again on September 30, 2008 to give him a second written warning, which stated "Amy and I expect you to immediately stop the disrespectful and insubordinate behaviors." (Def. Exh. 37). Finally, management again met with Graham to advise him of his termination two weeks later.

On August 15, 2009, the day after Denney's promotion was announced, Cook presented Graham with some handwritten notes setting forth his work schedule, break and lunch times. According to Graham, his previous schedule had never been an issue, and that he had an understanding with his previous branch manager, Chris Rolen, that he could come in a few minutes late on days when he had transportation issues related to his disabled daughter.

Cook has testified that he met with Graham to discuss his schedule because he understood that Graham no longer had transportation issues with his daughter, yet he was not arriving to work

on time. Chris Rolen testified that the flexible arrival time was only meant to resolve the transportation issues, not as a general excuse to avoid arriving on time. It is undisputed that Cook had a legitimate, non-discriminatory reason to ask about Graham's schedule, and Graham has not demonstrated that he still needed more time to coordinate transportation in August of 2009. Graham's subsequent written warnings each reference the Management Consultation, which include a discussion about Graham's schedule.

Graham notes that other Graybar workers have smoked in the same location as he, including Palmer. There is, however, no evidence that these employees ever smoked in the area after receiving a specific instruction not to do so. Further, with respect to Palmer, the evidence established that she had not smoked at all for the previous four to five years.

Finally, Graham notes that the initial verbal warning and the second (September 30, 2008) written warning do not specifically mention "smoking" as grounds for discipline. The memo from Cook (Def. Exh. 31), titled "Work Expectations," does focus on Graham's "We are done, I am done talking to you" comment, and concludes that Graham's comment "was unsatisfactory and borders on insubordination."

But the memo's general emphasis on respect and compliance with the directives of superiors was equally applicable to Graham's failure to comply with directives about proper smoking areas. Graham was instructed that there was "no reason for you to disrespect you immediate supervisor," and that Cook expected Graham to "be cooperative, supportive of [Denney] and be willing to meet her expectations." The previous (September 17, 2008) warning had specifically stated that Graham's refusal to abide by smoking restrictions was "insubordinate and must stop immediately." (Def. Exh. 33). And the final warning Graham received on October 2, 2008 was broadly worded and not limited to any particular action, directing Graham to "immediately stop the disrespectful and insubordinate *behaviors*." (Def. Exh. 37) (emphasis added).

18

**Conclusions of Law**

**Age Discrimination**

In order to demonstrate a claim for age-discrimination, Graham must demonstrate, among other things, that he would have received the promotion "but for" his age. *Gross v. FBL Finan'l Serv.*, 129 S.Ct. 2343, 2350 (2009). *See also MacKenzie v. Denver,* 414 F.3d 1266, 1278 (10th Cir. 2005). Graybar seeks summary judgment on the age discrimination claim by arguing that the evidence fails to show that its decision was based on the plaintiff's age.

Graham theorizes that Palmer also forced Bieri out of his position in order to make room for Denney, but he supplies no evidence that such a decision, even if it occurred, was motived by age or gender discrimination. Simple favoritism, which does not rest on discriminatory animus, is not illegal under federal employment law. *See Jaramillo v. Colorado Jud. Dept*. 427 F.3d 1303, 1314 (10th Cir. 2005). Bieri has testified that he believes he was doing his job adequately, but his subjective impressions are not conclusive. Palmer, prior to her promotion, had help train Bieri in the company's SAP program and was uniquely qualified to evaluate his success in adapting to that program. The role of this court is not to "'act as a super personnel department that second guesses employer's business judgments.'" *Id*. at 1308 (quoting *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs*., 165 F.3d 1321, 1330 (10th Cir.1999) (internal quotations in *Simms* omitted in *Jaramillo*)).

> Accordingly, minor differences between a plaintiff's qualifications and those of a successful applicant are not sufficient to show pretext. *Bullington v. United Air Lines, Inc*., 186 F.3d 1301, 1319 (10th Cir.1999), *overruled on other grounds, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). To show pretext, the disparity in qualifications must be "overwhelming." *Id*. at 1319 (citing *Sanchez v. Philip Morris*, 992 F.2d 244, 247-48 (10th Cir.1993)); *see also Odom v. Frank*, 3 F.3d 839, 847 (5th Cir.1993) (explaining that the difference in qualifications must be so glaring as to "jump off the page and slap us in the face").

*Id*. at 1308-09.

Thus, the court intervenes only where the losing candidate's employment record is so manifestly superior that any rational observer can only conclude that some secret, illegal rationale must be the employer's true motive. Graham makes no such showing here. He emphasizes that he had been at the company longer than Denney, that his recent evaluations had improved and were more favorable, and that as to his harassment of co-workers, "the record only shows one incidence with one co-worker, not multiple incidents or multiple co-workers." (Resp. at 30). But Graham's own subjective impressions of his job performance are of only limited value in this context. *See Furr v. Seagate Tech*., 82 F.3d 980, 988 (10th Cir. 1996) (finding plaintiff's subjective impressions of performance were not relevant).

Moreover, the positive factors cited by Graham must be balanced against Denney's documented college education, her consistently positive evaluations, a markedly better interview free from sarcastic and facetious responses, and complete freedom from any history of co-worker harassment. The plaintiff has failed to demonstrate that the defendant's selection of Denney over himself was a decision so lacking any business rationale that the court can or should infer that the true motive was age discrimination.

**Gender Discrimination**

A plaintiff presents a prima facie case of gender discrimination by proof that although a promotional opportunity was available for which he was qualified, the promotion was given to another candidate. *Klindt v. Honeywell Internat'l*, 303 F. Supp. 2d 1206, 1215 (D. Kan. 2004); *Garrison v. Gambro*, 428 F.3d 933, 937 (10th Cir. 2005). If the plaintiff makes this showing, the burden shifts to the employer to provide a legitimate, non-discriminatory basis for its action, which the plaintiff may rebut by evidence showing that the proffered rationale was a pretext. *Id*.

Here, Graybar's motion assumes the existence of a prima facie case of gender discrimination, but argues that it had a legitimate non-discriminatory reason for selecting Denney over Graham.

Specifically, it argues again that Denney was selected because of her positive evaluations and more successful interview. (Dkt. at 37, at 17). Graham responds by directly incorporating his earlier age-discrimination arguments. (Dkt. 40, at 33).

Those arguments did not compel denial of Graybar's motion as to Graham's age discrimination claim, and the result is the same as to the claim of gender discrimination. Graham argues that unlike Denney he had "15 years of supervisory experience" (counting his years of service in the military), and that while Denney had an associate degree, he had "the equivalent of a bachelor's degree." (*Id.* at 35). But these are comparisons which are the core of personnel department decisions. In the absence of some showing that the defendant's resolution of the competition was a mask for some ulterior motive, courts should not attempt to second-guess such difficult personnel decisions. Certainly the differences are not so extreme as to jump off the page.


**Retaliation**


Graham argues that he complained of the treatment he received during the promotion, and wass then subjected to illegal retaliation by the company. Graybar argues that the court should dismiss Graham's retaliation claim because the evidence fails to demonstrate a prima facie case of retaliation, and because – even if such were shown – it had a legitimate and non-pretextual rationale for terminating Graham.

A prima facie case of retaliation is presented when the plaintiff shows that he suffered an adverse employment action because of his opposition to discrimination. *Fye v. Oklahoma Corp. Com'n,* 516 F.3d 1217, 1227 (10th Cir. 2008). Graybar contends that Graham has failed to demonstrate the elements of a prima facie case because Graham never complained of any specific discrimination.

Graham's response argues at length that Graybar's rationale for his termination is a pretext for retaliation. On the question of whether he has presented a prima facie case of discrimination, he

points to only two facts: (1) that he met with Cook and Bieri on August 14, 2008 and stated he was taking the afternoon off to file a complaint with the KHRC, and (2) that on the KHRC complaint form he listed sex and age discrimination. (Dkt. 40, at 36).

But it is uncontroverted that, in his communications to Graybar, Graham never made allegations of any particular form of discrimination. At the meeting, Graham only made a generic suggestion of discrimination. He complained of his failure to obtain the promotion in an email to John Herbert on August 14, but this includes no claim of discrimination. Another email sent on August 22 mentions only general "retaliatory actions" and "protected activity" but not discrimination. And there is no evidence that any one at Graybar was aware of the contents of Graham's KHRC complaint.

As an element of a prima facie retaliation claim, the plaintiff must show protected activity in opposition to discrimination. The employee must have given notice of some particular form of discrimination, since

> a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim.

*Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004). *See also Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188-89 (10th Cir. 2002); *Montabon v. City and County of Denver*, 83 Fed. Appx. 265, 266 (10th Cir. 2003). In the present case, Graham never alerted any one at Graybar that he believed Denney was selected over him because of age or gender discrimination. He made only the most general of references to discrimination, and otherwise indicated that he was so angry that he was unable to communicate coherently.

Even if the court were to assume the existence of a prima facie case, summary judgment would remain appropriate, because Graybar has demonstrated a legitimate rationale for Graham's termination – his documented acts of insubordination – and the plaintiff has failed to demonstrate that rationale was pretextual. In his response, Graham cites several factors as supposedly demonstrating that Graybar's rationale for the termination was pretextual: Graybar failed to follow

its announced policy with respect to employee discipline, that the alleged misconduct did not warrant termination, and the timing of the termination – roughly seven weeks after Graham complained that he had been discriminated against when Denney was selected for the promotion.

The court finds that the plaintiff has failed to demonstrate that the defendant violated company policy in the way that it employed its progressive discipline policy. The plaintiff relies entirely on the testimony of Bieri, who has suggested that the Graybar's policy was to employ that policy only as to the same offense. That is, it was obliged to institute separate progressive disciplinary schedules for each type of alleged offense – one for refusing to smoke where he was told, one for walking away from Denney while she was trying to meet with him, and so forth. But this alleged policy has no apparent basis in the company's actual, written policy. Bieri was not the decision-maker with respect to the termination, and was not in charge of setting company policy with respect to how the company treated underlying offenses. More importantly, all of the acts for which Graham was disciplined were minor variations in a continuing pattern of insubordination, and nothing in either company policy or common sense would require the defendant to treat each separate act of insubordination as a wholly discrete event.

The underlying facts are uncontroverted. He failed to abide by or follow instructions about where to smoke. He refused to comply with the instructions from his supervisor Denney. He approached the promotion in a belligerent and sarcastic manner, and subsequently engaged in repeated acts of insubordination. Graham terminated one meeting with Denney by announcing "I am done talking with you," and abruptly walking away in a manner that forced Denney to move to avoid a physical collision. As noted above, when Denney asked him to supply additional customer information, Graham responded by writing, "THIS INFO IS REDUNDANT AND UNNECESSARY." Warned in writing about his conduct, he replied, "NO OFFENSE, BUT I REALLY DON'T NEED A BABYSITTER." The plaintiff has failed to show that the company's reaction – a series of verbal and written warnings, which Graham either failed to heed or summarily

rejected – was a mask for discrimination. Graham announced that he would "butt heads" with Denney as long as she was the Manager of Customer Services.

The record does not demonstrate that Graham was terminated for offenses so trivial in nature that an infererence of pretext arises. Rather the conduct was sufficiently serious and continuous that the defendant could justifiably conclude that Graham's conduct was intolerable and would not improve.

Graham suggests that an inference should arise from the fact that he "never had a prior history of disciplinary actions being taken against him." (Dkt. 40, at 45). That is, he was never sanctioned for insubordination prior to his unsuccessful bid for the Manager of Customer Services position. Instead, he argues, "once Denney took over" the service manager position, "all hell broke loose." (*Id.*) Graham's argument as to pretext would have merit if he pointed to known acts of insubordination which the defendant ignored prior to the promotion. Instead, all of the evidence points to an increasing animosity between Graham and Denney after the promotion. That is, to the extent the evidence suggests there was any retaliation in the wake of the promotion, it is that Graham retaliated against Denney by initiating a series of belligerent and insubordinate reactions to legitimate supervisory instructions.

Finally, as noted earlier, Graham suggests that the timing of the termination is such that the court should infer the termination was pretextual, relying on *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir.1999). In *Anderson*, the court held that a period of six weeks between the protected activity and adverse job action, "may by itself, establish causation." But the court in Anderson was explicitly dealing with causation as an element of the plaintiff's prima facie case; it did not hold that timing alone could constitute proof of pretext, and the court has subsequently emphasized that pretext must be demonstrated by evidence beyond mere timing. In *Bergersen v. Shelter Mutual Ins. Co.*, 229 Fed. Appx. 750, 755 (10th Cir. 2007), after noting Kansas law holding that timing alone was insufficient, the court stressed that federal law was consistent:

Moreover, this court has echoed that sentiment in a variety of related contexts. *See, e.g., Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir.2004) (observing in Title

24

VII retaliation case that "close temporal proximity is a factor in showing pretext, yet is not alone sufficient to defeat summary judgment"); *Anderson*, 181 F.3d at 1180 (holding that absent other evidence, temporal proximity alone did not establish pretext for retaliation under the ADA); *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397-98 (10th Cir.1997) (noting that temporal proximity alone does not constitute pretext for retaliatory discharge under the FLSA); *see also Hysten v. Burlington N. Santa Fe Ry.*, 372 F.Supp.2d 1246, 1257 (D.Kan.2005) (stating that to the extent that *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187 (10th Cir.2002), "implies that temporal proximity is sufficient for purposes of the pretext analysis, it would appear to be inconsistent with both prior and subsequent Tenth Circuit opinions"). Thus, we conclude that Mr. Bergersen's claim of temporal proximity is insufficient, standing alone, to raise a genuine issue of pretext. *See Vanover*, 260 F.3d at 1186.

## After-Aquired Evidence

Finally, Graybar argues that even if the rest of its arguments are rejected, Graham's remedies are limited by its subsequent discovery that Graham had failed to reveal his earlier termination from AutoZone. It argues that the plaintiff should not receive any award of front pay or reinstatement, and any recovery for back pay should be limited to the time it discovered this concealment.

After-acquired evidence of employee misconduct may limit the ability of the employee to recover damages where the evidence establishes that "the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 363 (1995). Graham responds by advancing a factual argument that the omission of the information would not objectively justify termination and that Graybar would not in fact have actually terminated him even if it had known of the omitted information. (Dkt. 40 at 47-49). He agues that the application form language does not automatically require termination for all omissions, since otherwise "the defendant would be 'justified' in terminating an applicant for failing to list their middle initial or transposing numbers on their driver's license number." (*Id.* at 47). Generally, he argues, the information relating to AutoZone fails to document

the nature and severity of said comment(s) and/or incident(s). Accordingly, defendant cannot prove that it would have terminated the plaintiff based upon this AutoZone form alone, as it does not specify the severity of plaintiff's purported

conduct, and no further facts were uncovered or presented by the defendant before discovery closed.

*Id.* at 48.

But these arguments are untenable in light of the facts which are uncontroverted in the case. Notwithstanding Graham's argument that the company policy should be construed to apply to only serious or material omissions,[5] the application form specifically provides that "any misstatement or omission of information is grounds for dismissal." More importantly, Graham specifically admitted Graybar's Statement of Fact Paragraph 70, which provides:

> Graybar was not aware of Graham's termination from AutoZone during Graham's employment with Graybar. *Had Dolan Cook known about the termination from AutoZone, he would have terminated Graham's employment.*

(Emphasis added).

In light of this admission, the court holds that the defendant is entitled to the protection of the defense recognized in McKennon, and holds that independent of the merits of the remainder of Grayar's motion, Graham's recovery would be limited in the manner described in Graybar's motion.

IT IS ACCORDINGLY ORDERED this 25th day of August, 2010, that the defendant's Motion for Summary Judgment (Dkt. 36) is hereby granted.


s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

---

[5]It may also be doubted that a prior termination in which Graham was terminated for "unprofessional behavior, inappropriate comments, conduct detrimental to AutoZone, fellow AutoZoners and AutoZone customers, and loss of confidence" could ever be considered a matter comparable to an employee's "failing to list their middle initial or transposing numbers on their driver's license number," as suggested by the plaintiff.